**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Schnellecke Logistics USA LLC, et al., | No. CV-22-01893-PHX-SMB |
| Plaintiffs, | **ORDER** |
| v. | |
| Lucid USA Incorporated, et al., | |
| Defendants. | |

Pending before the Court is Defendants Lucid USA Inc. and Lucid Motors Canada, ULC's (collectively "Lucid") Motion to Compel Arbitration of the Claims in the First Amended Complaint, and to Dismiss and/or Stay Proceedings. (Doc. 21.) Plaintiffs Schnellecke Logistics USA, LLC and Schnellecke Logistics Arizona, LLC (collectively "Schnellecke") filed a Response (Doc. 27), and Lucid filed a Reply (Doc. 28). Additionally, the Court read and considered the supplemental memorandums that were provided at the Court's request. (Docs. 35 & 36.) The Court exercises its discretion to resolve this Motion without oral argument. *See* LRCiv 7.2(f) ("The Court may decide motions without oral argument."). After reviewing the parties' arguments and the relevant law, the Court will grant Lucid's Motion for the following reasons.

**I.    BACKGROUND**

This case involves a contract dispute between Lucid, which manufactures electric luxury vehicles (Doc. 21 at 3), and Schnellecke, a third-party logistics company (Doc. 16 at 2). Lucid hired Schnellecke "to provide warehousing, light manufacturing/assembly,

and supplement management, including, but not limited to managing, storing, loading, moving, transferring, delivering, kiting, sub-assemblies and otherwise handling supplier-owned products." (Doc. 16 at 2.) The parties entered into a Master Services Agreement ("MSA") on March 7, 2022, in which they memorialized their intent to contract. (*Id.*) About two weeks later, the parties entered into a separate Statement of Work agreement ("SOW") that set forth the specifics of their contractual relationship. (*Id.*) On July 21, 2022, Lucid gave Schnellecke written, 30-days' notice of its termination of the MSA and SOW. (*Id.* at 3.) Schnellecke continued to provide logistics services until August 20, 2022. (*Id.* at 4.)

On two occasions in August 2022, Schnellecke sent Lucid invoices totaling $5,029,762.67. (*Id.*) Lucid had issued a purchase order authorizing payment of invoices for work already performed "up to $5.3 million." (*Id.*) Two invoices totaling $2,644,965.79 were due to be paid by September 1, 2022, and another invoice totaling $2,384,796.88 was due to be paid the following month. (*Id.*) Lucid did not pay the invoiced amounts by the appropriate due dates, and on September 7, 2022, Lucid communicated its intent to reject all invoices sent by Schnellecke based on "substandard performance of the [third-party logistics] services" Schnellecke provided. (*Id.* at 5.) Lucid instead communicated it believed to have sustained $130 million in damages related to Schnellecke's substandard performance. (*Id.*) Lucid also informed Schnellecke of its belief that Schnellecke failed to return more than $17,000 worth of computer equipment. (*Id.* at 6.)

Schnellecke filed this lawsuit in Maricopa County Superior Court. (*See* Doc. 1.) Lucid removed the action to this Court and now moves to compel arbitration. (*See id.*; Doc. 21.)

## II.   LEGAL STANDARD

The Federal Arbitration Act ("FAA") provides that written agreements to arbitrate disputes "shall be valid, irrevocable, and enforceable, save upon such grounds that exist at law or in the equity for the revocation of a contract." 9 U.S.C. § 2; *see also AT&T Mobility*

*LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (discussing the liberal federal policy favoring valid arbitration agreements). The FAA "leaves no room for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218 (1985). "The court's role is to answer two gateway questions: does a valid agreement to arbitrate exist, and does the agreement encompass the dispute at issue." *Adams v. Conn Appliances Inc.*, No. CV-17-00362-PHX-DLR, 2017 WL 3315204, at *1 (D. Ariz. Aug. 3, 2017) (citing *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000)). If so, the court must compel arbitration. *Id.*

"Where a contract contains an arbitration clause, courts apply a presumption of arbitrability as to particular grievances, and the party resisting arbitration bears the burden of establishing that the arbitration agreement is inapplicable." *Wynn Resorts, Ltd. v. Atl.-Pac. Cap., Inc.*, 497 Fed. Appx. 740, 742 (9th Cir. 2012). However, state law is not entirely displaced from federal arbitration analysis because "generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening § 2 [of the FAA]." *Ticknor v. Choice Hotels Int'l, Inc.*, 265 F.3d 931, 936–37 (9th Cir. 2001) (citing *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 686 (1996)).

**III.   DISCUSSION**

The parties do not dispute some key features of this case. The parties agree that California law governs their dispute, that Schnellecke assented to the MSA, and that the MSA contains a mandatory arbitration provision. (*See* Docs. 21 at 6 n.7, 7, 10; 27 at 3.) But Schnellecke contends the arbitration provision is inapplicable to its claims due to superseding language in the SOW. (Doc. 27 at 7.) Schnellecke also contends the arbitration provision is invalid because it is unconscionable. (*Id.* at 8.)

Multiple contracts govern the parties' contractual relationship. Schnellecke contends the SOW represents the parties' final word on the issue of arbitrability, while

Lucid contends the MSA controls. "The Supreme Court has emphasized that the 'first principle' of its arbitration decisions is that '[a]rbitration is strictly a matter of consent and thus is a way to resolve those disputes—*but only those disputes*—that the parties have agreed to submit to arbitration.'" *Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 741–42 (9th Cir. 2014) (quoting *Granite Rock Co. v. Int'l Bd. of Teamsters*, 561 U.S. 287, 299 (2010)). District courts apply state law principles of contract interpretation to determine whether the parties have consented to arbitration while respecting the federal policy "in favor of arbitration by resolving ambiguities as to the scope of arbitration in favor of arbitration." *Id.* at 742 (quoting *Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d 1042, 1044 (9th Cir. 2009)).

> The MSA sets forth:
> Any Dispute will be resolved first through good faith negotiations between the parties. If the Dispute cannot be resolved through good faith negotiation, then the parties agree to submit the Dispute to mediation. . . . If the Dispute is not otherwise resolved through negotiation or mediation within a reasonable time period (such time period not to exceed seventy-five (75) days, the Dispute shall be submitted to binding arbitration with the American Arbitration Association . . . and arbitration will be the exclusive forum for adjudication of the dispute.

(Doc. 26 at 44.) Again, neither party disputes the MSA's content or its directive to submit the parties' contractual disputes to arbitration.

The SOW "specifies the additional terms and conditions specific to the operation at the Lucid Arizona Campus of plants under which [Schnellecke] will provide contract warehouse services and shuttles on occasion to Lucid." (*Id.* at 4.) The SOW contains an "Order of Precedence" provision stating, "[i]n the event of any conflict between the provisions of this SOW and any Attachment, the order of precedence is as follows": the SOW, the SOW Attachments, instructions on the front of Lucid's release or broadcast schedule, the MSA. (*Id.*) As to disputes, the SOW includes a "Governing Law and Venue" provision that asserts the SOW will be governed by California law and "[n]otwithstanding Section 21.1 of the MSA, the Parties may elect to commence any dispute resolution or litigation action in the venue of the County of Maricopa." (*Id.* at 23.)

### A.     MSA & SOW

Schnellecke argues its claims "might have fallen within the scope of the MSA's arbitration provision . . . had they not agreed to the superseding Forum Selection Clause in the SOW." (Doc. 27 at 3–4.) But Schnellecke's interpretation of these agreements is unsupported by the contracts' language. Schnellecke relies on the SOW's Order of Precedence provision to assert that the SOW's forum selection clause displaces the MSA's arbitration agreement. (Doc. 27 at 7–8) (citing *Galaxia Elecs. Co., Ltd. v. Luxmax, U.S.A.*, No. LA CV16-05144 JAK (GJSx), 2018 WL 11421517, at *8 (C.D. Cal. June 6, 2018) ("Whether the arbitration clause . . . was superseded by the forum-selection clause in the [subsequent agreement], . . . depends on whether the forum-selection clauses in those agreements are 'sufficiently specific to impute to the contracting parties the reasonable expectation that they are superseding, displacing, or waiving an earlier arbitration obligation.'" (quoting *Goldman*, 747 F.3d at 743)).

The SOW does not clearly displace the MSA, because the Order of Precedence provision only seeks to resolve conflicts between provisions in this SOW itself or the SOW attachments. (*See* Doc. 26 at 4.) The purportedly conflicting contractual provisions are not based on the SOW or any SOW attachment, but rather the SOW and the MSA. The Order of Precedence provision is therefore inapplicable to the Court's construing the MSA's mandatory arbitration provision and the SOW's forum selection clause. Lucid asserts the two provisions do not conflict. The Court agrees. As Lucid notes, the MSA identified Alameda County, California as the exclusive venue for potential disputes. (*Id.* at 43.) The SOW clearly displaced that choice of venue by expressing that the parties *may* file dispute resolutions or litigation in Maricopa County. (*Id.* at 23.) Contrary to Schnellecke's argument, the forum selection clause merely *permits* the parties to file any dispute resolution or lawsuits in Maricopa County should they mutually agree to deviate from their earlier agreement. The Court thus finds that the SOW's language creates no reasonable expectation that the parties have superseded, displaced, or waived the MSA's mandatory arbitration provision. *See Goldman*, 747 F.3d at 743.

Finally, as Lucid points out, Ninth Circuit law supports their position that the venue or forum selection clauses are not in conflict with the arbitration clause. Venue provisions are necessary because "[n]o matter how broad the arbitration clause, it may be necessary to file an action in court to enforce an arbitration agreement, or to obtain a judgment enforcing an arbitration award, and the parties may need to invoke the jurisdiction of a court to obtain other remedies." *Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, 1209 (9th Cir. 2016) (alteration in original) (quoting *Dream Theater, Inc. v. Dream Theater*, 124 Cal.App.4th 547, 556 (Cal. Ct. App. 2004), *as modified on denial of reh'g* (Dec. 28, 2004)). "[B]road arbitration clauses are not rendered ambiguous when they preserve some role for courts." *Jacksen v. Chapman Scottsdale Autoplex, LLC*, No. CV-21-00087-PHX-DGC, 2021 WL 3410912, at *5 (D. Ariz. July 21, 2021).

**B.      Unconscionability**

Schnellecke argues the arbitration agreement is unenforceable because it is unconscionable. (Doc. 27 at 8.) Under California law, an agreement may be deemed unconscionable only if it is both procedurally and substantively unconscionable. *Kilgore v. KeyBank, Nat'l Ass'n*, 718 F.3d 1052, 1058 (9th Cir. 2013). "These two prongs operate on a sliding scale: the lesser the procedural unconscionability, the greater substantive unconscionability must be shown, and vice versa." *MacClelland v. Cellco P'ship*, 609 F. Supp. 3d 1024, 1033 (N.D. Cal. July 1, 2022). Procedural unconscionability focuses on "oppression or surprise that results from unequal bargaining power" while substantive unconscionability deals more with "overly harsh or one-sided results." *Klink v. ABC Phones of N.C.*, No. 20-cv-06276-EMC, 2021 WL 3709167, at *9 (N.D. Cal. Aug. 20, 2021).

**1.      Procedural Unconscionability**

Schnellecke contends the arbitration agreement is procedurally unconscionable because it is a contract of adhesion and contains an element of surprise. (Doc. 27 at 9–10.) An arbitration agreement is at least minimally procedurally unconscionable if it is an adhesion contract. *MacClelland*, 609 F. Supp. 3d at 1033. But being an adhesion contract

alone is insufficient to invalidate an arbitration agreement. *Id.* An adhesion contract is "a standardized contract, drafted by the party of superior bargaining strength, that relegates to the subscribing party only the opportunity to adhere to the contract or reject it." *Ting v. AT&T*, 319 F.3d 1126, 1148 (9th Cir. 2003).

Schnellecke claims Lucid, "a large, powerful vehicle manufacturer" drafts standard form contracts to its benefit "without any opportunity to negotiate." (Doc. 27 at 10.) Schnellecke continues, asserting Lucid expressly represented that the MSA was non-negotiable. (*Id.*) Lucid counters that aside from Schnellecke's characterization of Lucid as large and powerful, Schnellecke points to no evidence that Lucid had superior bargaining strength. (Doc. 28 at 8.) Lucid also notes that Schnellecke is a sophisticated corporate entity in the business of providing the exact services Lucid sought. (*Id.*) Citing *Cotchett, Pitre & McCarthy v. Universal Paragon Corp.*, 187 Cal. App. 4th 1405, 1421 (Cal. Ct. App. 2010), Lucid argues the parties' equal sophistication precludes a finding that Lucid had superior bargaining strength. (Doc. 28 at 8.) The Court agrees. The court in *Cotchett* noted that the party challenging the contract's enforceability was a corporate client that "could have employed any of a number of law firms in lieu of" the plaintiff law firm. 187 Cal. App. 4th at 1421. And the executed fee agreement "was a private business transaction between equally matched parties." *Id.* Here, the parties are also equally matched. Lucid is a car manufacturer that sought third-party logistics services of the type that Schnellecke ordinarily provided. Schnellecke freely chose to take on Lucid as its client and cites to no evidence to support its conclusory assertion that Lucid had superior bargaining strength. After reviewing the MSA, Schnellecke could have rejected Lucid's business and continued servicing other clients. Even if Lucid drafted and proposed the MSA on a take-it-or-leave-it basis, the parties' equal bargaining power eliminates a finding that the MSA was a contract of adhesion.

"Surprise involves the extent to which the supposedly agreed-upon terms are hidden in a prolix printed form drafted by the party seeking to enforce them." *Newton v. Am. Debt Servs., Inc.*, 854 F. Supp. 2d 712, 722–23 (N.D. Cal. 2012). Schnellecke asserts it was

unaware of the MSA's arbitration provision and that even with careful review, the arbitration clause was inconspicuously placed because the MSA's subheading is titled "Disputes." (Doc. 27 at 10–11; *see also* Doc. 26 at 44.) Schnellecke also asserts it had "no reason to know of the arbitration provision because its primary contract—the SOW—was clear as to its rights to litigate." (*Id.* at 11.) The Court finds Schnellecke's assertions lack merit. The parties executed the MSA weeks before they executed the SOW. (*See id.* at 1.) The MSA is an 18-page document organized by many headings and subheadings. In section 21.2, which is titled "Disputes," the MSA expresses the parties' intent to resolve disputes through negotiations, then mediation, then arbitration. (Doc. 26 at 44.) Schnellecke seems to suggest it would have had proper notice of the arbitration agreement had section 21.2 been titled "Arbitration" instead of "Disputes." Such a suggestion is disingenuous. Section 21.2 is the only provision that addresses how to resolve disputes, and "Dispute" is a defined term on the first substantive page of the MSA.

While Schnellecke believes that its full agreement with Lucid was set out in the SOW, it does not dispute the contractual nature of the MSA or the MSA's purpose to contextualize their future agreements. *See id.* Schnellecke's reliance on what it describes as the SOW's superseding language is unfounded, as that agreement was executed weeks after signing the MSA. Schnellecke had an opportunity to review the MSA and its terms as well as an opportunity to object to the MSA's arbitration agreement. That Schnellecke did not "notice" that the agreement it signed contained an arbitration agreement does not relieve Schnellecke of the MSA's obligations. Finding the MSA was not a contract of adhesion and that the arbitration provision was not a surprise, the Court concludes Schnellecke has failed to establish procedural unconscionability.

### 2. Substantive Unconscionability

"Substantive unconscionability focuses on the effects of the contractual terms and whether they are overly harsh or one-sided." *Newton*, 854 F. Supp. 2d at 724 (cleaned up). "The term focuses on the terms of the agreement and whether those terms are so one-sided as to shock the conscience." *Soltani v. W. & S. Life Ins. Co.*, 258 F.3d 1038, 1043 (cleaned

up). Schnellecke argues the arbitration provision is substantively unconscionable because it greatly limits Schnellecke's remedies. (Doc. 27 at 13.)

Schnellecke specifically challenges the following language in the arbitration provision: "the Dispute shall be submitted to binding arbitration with the American Arbitration Association ("AAA") in accordance with the AAA's Commercial Arbitration Rules then in effect, *as amended by this Agreement*." (*Id.*; Doc. 26 at 44.) The arbitration provision continues, "[t]he arbitrator(s) will have the authority to apportion liability between the Parties but will not have the authority to award any damages or remedies not available under, or in excess of, the express terms of this Agreement." (*Id.*) Schnellecke argues this language has "unilaterally amended the AAA rules to its sole advantage, by . . . preventing the arbitrator from awarding damages or remedies 'not available under' the Agreement." (Doc. 27 at 13.) Both the MSA and SOW set forth damages and obtainable relief.

The MSA sets out in relevant part:

17.5 **Exclusion of Certain Damages**

(a) in no event will Lucid be liable to [Schnellecke] or to any third party for any loss of use, revenue or profit or for any consequential, incidental, indirect, exemplary, special or punitive damages whether arising out of breach of agreement, tort (including negligence) or otherwise, regardless of whether such damage was foreseeable and whether or not such party has been advised of the possibility of such damages.

(b) Lucid will not be liable for any damage or injury to the person, business (or any loss of income therefrom), goods, wares, merchandise or other property of [Schnellecke], [Schnellecke]'s employees, invitees, customers or any other person in or about the Lucid facilities, whether such damage or injury is caused by or results from: (a) fire, steam, electricity, water, gas or rain; (b) the breakage, leakage, obstruction or other defects of pipes, sprinklers, wires, appliances, plumbing, air condition or lighting fixtures or any other cause; (c) conditions arising in or about the Lucid facilities or in connection with the Service, or from other sources or places; or (d) any act or omission of any third party at the Lucid facilities.

17.6 **Liability**
[Schnellecke] will be liable to Lucid for any loss of business, interruption of business, lost profits or goodwill, indirect, special, incidental, exemplary or consequential damages arising out of this Agreement, subject to the

following caps (which do not pertain to damages resulting from [Schnellecke]'s gross negligence or willful misconduct). This annual contract value is based on approved invoices for twelve (12) consecutive months using a rolling invoice value.

| Annual Contract Value | Annual Liability Limit | Per Incident Limit |
|---|---|---|
| $0-$5M | $150K | $50K |
| $5,000,001-$10M | $375K | $125K |
| $10,000,001-$20M | $600K | $200K |
| $20M+ | $900K | $300K |

19.3(e)   **Specific Performance and Injunctive Relief**

**[SCHNELLEKE] ACKNOWLEDGES THAT LUCID WILL SUFFER IRREPARABLE HARM IF LUCID INVOKES RIGHTS UNDER THIS SECTION AND [SCHNELLECKE] FAILS TO COOPERATE WITH LUCID IN THE TRANSITION OF THE PERFORMANCE OF SERVICES TO TRANSFEREE(S) IN ACCORDANCE WITH THE TERMS OF THIS SECTION AND IN A TIMELY MANNER. BECAUSE LUCID DOES NOT HAVE AN ADEQUATE REMEDY AT LAW AND WOULD BE IRREPARABLY HARMED BY SUCH A FAILURE, [SCHNELLECKE] AGREES THAT LUCID IS ENTITLED TO INJUNCTIVE RELIEF . . . INCLUDING SPECIFIC PERFORMANCE . . . [SCHNELLECKE] WAIVES, TO THE FULLEST EXTENT POSSIBLE UNDER APPLICABLE LAW, THE RIGHT TO NOTICE IN CONNECTION WITH ANY JUDICIAL PROCEEDINGS INSTITUTED BY LUCID TO ENFORCE ITS RIGHTS UNDER THIS SECTION.**

(Doc. 26 at 41–42.)

The SOW sets out in relevant part:

6.19.2.3. [Schnellecke] is liable for all costs to rework damaged Products to the extent caused by [Schnellecke's] negligence including, but not limited to, in house, cosmetic and damages to any scrap exposure as well.

6.19.4.1. [Schnellecke] is one hundred (100) percent liable for all in house damage (including cosmetic damage) caused by [Schnellecke]. The liability includes Product replacement costs and replacement transportation and re-boxing services.

6.19.4.3. [Schnellecke] will accept full financial liability for all costs associated with repairing and re-boxing Products that is damage is caused by [Schnellecke].

6.22. [Schnellecke] is liable for any direct damages for the loss or damage to Products caused by [Schnellecke], its employees, subcontractors and/or agents during the performance of the 3PL Services subject to the maximum amount of ten million

(10,000,000) United States dollars (USD) in the aggregate for all events occurring during each twelve (12) month period during the effectiveness of this SOW.

(*Id.* at 17–18.)

Schnellecke highlights these provisions to note that the MSA and SOW effectively preclude it from recovery because they omit any mention of Schnellecke's recoverable damages. (Doc. 27 at 15.) Citing *Harper v. Ultimo*, 113 Cal. App. 4th 1402, 1406 (Cal. Ct. App. 2003), Schnellecke argues an arbitration agreement that limits one party from receiving a full recovery while only slightly limiting the other party's damages is substantively unconscionable. (Doc. 27 at 16–17.) Schnellecke also cites *Stirlen v. Supercuts, Inc.*, 51 Cal. App. 4th 1519, 1530 (Cal. Ct. App. 1997), where the California Court of Appeals affirmed the trial court's conclusion that the parties' arbitration agreement was "so one-sided as to be unconscionable," because "Defendants can use the court system for certain claims, but the plaintiff must use arbitration for all his, with very limited damages." (Doc. 27 at 16 n.4.)

Lucid distinguishes the cases Schnellecke cites, arguing that those cases involve only consumer or employment contracts, and asserts courts ordinarily uphold limitations of liability in "commercial agreements between sophisticated parties." (Doc. 28 at 11) (citing *Food Safety Net Servs. v. Eco Safe Sys. USA, Inc.*, 209 Cal. App. 4th 1118, 1126 (Cal. Ct. App. 2012). In *Food Safety*, the California Court of Appeals held the limitation of liability provision was not unconscionable despite the agreement's effectively limiting the plaintiff's liability for breaches of contract and negligence. 209 Cal. App. 4th at 1127. The *Food Safety* court affirmed the parties' right to contract one party's protection from "unlimited liability." *Id.* at 1126. Lucid also cites *TSI USA LLC v. Uber Techs., Inc.*, No. 17-cv-03536-HSG, 2020 WL 5257873, at *4 (N.D. Cal., Sept. 3, 2020), to argue that parties are allowed to limit their liability as laid out in the MSA and SOW. (Doc. 28 at 12.) The *TSI* court found that such a limitation of liability clause is not unenforceable merely because one party "may be unable to recover substantial costs from [the other]." *Id.* at *4–5 (affirming a $200,000 liability cap and reiterating that "[i]f Plaintiff incurred

costs under the Agreements that it cannot recoup because of the termination, that was Plaintiff's hazard in entering into the Agreements with this limitation of liability provision.").

The Court finds the limitation of liability clause does not render the MSA and SOW substantively unconscionable. The MSA's definition of "Dispute" includes breaches or termination of the agreements and any dispute about non-contractual obligations related to them. (*See* Doc. 26 at 31.) Though the MSA precludes Schnellecke from recovering many types of damages, it does not foreclose Schnellecke's recovery of direct damages resulting from Lucid's breaching the agreements. The damages cap table from section 17.6 does not limit Schnellecke's recovery in any way. Rather, it sets forth limits on damages that Lucid can recover from Schnellecke for various types of damages including loss of business and lost profits. (*See id.* at 41.) Section 6.22 from the SOW is similar, limiting Lucid's potential recovery from loss or damage to its products to a maximum $10 million amount. (*Id.* at 18.) The Court also rejects Schnellecke's characterization of section 19.3(e). Section 19 establishes a three-year term and explains the method and obligations related to termination. (*See id.* at 42.) Section 19.3(e) permits Lucid to seek injunctive relief or specific performance should Schnellecke not cooperate with Lucid in transitioning logistics services upon termination of the parties' agreements. The MSA therefore does not eliminate Schnellecke's access to judicial relief while simultaneously protecting Lucid's. None of these provisions shock the Court's conscience. *See Baltazar v. Forever 21, Inc.*, 367 P.3d 6, 14 (Cal. 2016). "A contract can provide a 'margin of safety' that provides the party with superior bargaining strength a type of extra protection for which it has a legitimate commercial need without being unconscionable." *Id.* at 15. Section 19.3(e) illustrates Lucid's commercial need to prevent disruption to logistical services. None of the provisions Schnellecke cite support a finding of substantive unconscionability. In the absence of either procedural or substantive unconscionability, the Court finds the arbitration agreement is enforceable.

IV.  **CONCLUSION**

Accordingly,

**IT IS ORDERED** granting Lucid's Motion to Compel Arbitration of the Claims in the First Amended Complaint, and to Dismiss and/or Stay Proceedings.  (Doc. 21.)  This case will be dismissed.

**IT IS FURTHER ORDERED** instructing the Clerk of Court to terminate this case.

Dated this 23rd day of August, 2023.

_____
Honorable Susan M. Brnovich
United States District Judge